Before we begin, Judge Gordon and I would like to say that we're delighted that the Honorable Paul Huck from the Southern District of Florida is sitting with us. He's been with us on several occasions and this is just one more tour of duty as it were. We'll begin with the United States v. Kowalowski. Victoria Calvert May it please the Court, my name is Victoria Calvert and I represent Mr. Kowalowski. Mr. Kowalowski should not have been convicted of wire fraud because there was insufficient evidence that he had the intent to defraud SJK's investors. At Mr. Kowalowski's trial, the government presented the testimony of several institutional investors who had invested into the absolute return funds. All but one of those investors were long-term investors who had invested, who had been investing with Mr. Kowalowski for years before he had started SJK Investment Management. These investors followed him because they were pleased with the returns they were getting. Mr. Kowalowski provided each investor with a private placement memorandum or PPM for the absolute return fund they were investing in. The PPM defines the agreement between SJK and the investors, including SJK's obligations to the investors. The PPM stated that substantially all of its assets would be invested in investment funds sponsored by unaffiliated investment managers. In calculating the net asset value of the fund, the PPM stated that it would rely on valuation information, including estimates provided by third parties, but that the fund had the right to deviate from such valuation information when deemed appropriate. Wasn't there some evidence that some of the information and materials given to the investors after the PPM was materially incorrect? Are you referring to the monthly statements, Your Honor? Among others, yes. The monthly statements did have valuations for which there was no third-party appraisal. However, they did state that they were estimates. The PPM stated that estimates would be provided, and Mr. Kowalowski had planned to have the Special Opportunities Fund audited as well as the Absolute Returns Fund audited in 2011. But, I mean, some of the valuations or estimates, if you want to give them that word, were wildly off the mark, were they not? So that a reasonable jury might be able to infer intent to defraud. In other words, if you have a property or an asset that a third party might independently value at $3 million and you're a little more optimistic and you value it at $3.5 or $4, you know, okay, but if you've got something, and I'm not saying these are the numbers in Mr. Kowalowski's case, but if you've got an asset that's a million and you're valuing it at $9, then, you know, alarm bells start to go off. Weren't the numbers closer to the latter than the former hypothetical? Yes, Your Honor, but even with that concession, I think the court's ruling in Tackle Off states that false information does not necessarily equate to an intent to deceive, intent to defraud. Right, I agree with that. I mean, it's not enough, but it's part of the whole nucleus of facts that a jury is allowed to take into account, right? Right, but I also think in this situation, we were dealing with very sophisticated investors who were given a document that stated in numerous places, this is risky investment. Do not rely on this as your entire investment strategy. Only invest if you are prepared to lose all of your money. And so it is different from a situation where someone was guaranteed specific returns. There was nothing here, no guarantees. No, I agree with that, too. But there were other indicia of fraud, or at least it looks like there was. For example, he sold one of his houses for a million dollars more than he bought it at a time when the real estate market was more down than up. Right, and that's not something that one would expect to see from someone who's handling other people's money when you're self-dealing. Well, I think Mr. Kovalevsky was optimistic in terms of believing the properties were distressed, that in the long run, they were going to bounce back as the market has bounced back since, and they would make money for the investors. However, he has acknowledged that it was wrong, and that is why he repurchased the homes from the Special Opportunities Fund, to make it right, because those personal homes was not something he should have done. Ms. Scarborough, besides being way off the mark, didn't the appraiser, Brian Koval, testify that he had told your client that the market had tanked, and rather than $3.3 million valuation he was placing on the home that was worth about $1 million? Yes, that was Mr. Koval's testimony. Isn't that a pretty good indication that he's told by the appraiser, who is someone who knows about real estate, that it is grossly overvalued? He was, but as I've stated, Mr. Kovalevsky was looking far ahead, taking the long-term view that these were going to rebound. Assuming that is the case, then doesn't he have an obligation to advise the investors that while it is only worth $1 million today, the outlook is going to be better, the market is going to rebound, et cetera, rather than just going ahead and valuing it over three times its true value? Mr. Kovalevsky's plan was to have the properties, the special opportunities funds, the absolute return funds audited in 2011 once the fiscal year ended, and then the investors would have been told. Another statement that your client told Mr. Mumford, I think it was, that his funds would not be reinvesting in affiliated funds, only unaffiliated funds, and yet a substantial amount of the assets of the original funds were placed in his affiliated fund. Wouldn't that be a misrepresentation, a serious misrepresentation? At the time that I believe Mr. Kovalevsky made that representation to Mr. Mumford, I believe it was before the special opportunities fund was created. But he said, I am not going to invest in affiliated funds, and then sometime thereafter invest in affiliated funds. Isn't that a misrepresentation, a serious one? Not if he didn't contemplate investing in affiliated funds at the time he made the statement. So it is a question of his intent? Yes. And the jury is entitled to hear all the facts and draw an inference of his intent based on the overall facts in this case? They are, Your Honor. But I do believe the PPM did allow Mr. Kovalevsky to do everything that he did, invest a portion of investor money into an affiliated fund to estimate the valuations to, he disclosed that conflicts of interest existed. So all of these things, the investors were on notice. And that is your basic defense in this case, that the documents themselves give him some discretion and he has disclosed certain things. But all these things that occurred, the subsequent investment in an affiliated fund, the valuation of the homes and other things, none of those were ever disclosed to the investors, were they? Right. But my point is, if he is entitled to do that, would it follow that if he is entitled to do it and he feels comfortable in his discretion, that he would have disclosed all these things which were somewhat, someone would say questionable? I don't see the PPM as giving him discretion as you phrase it. I see the PPM as being the agreement. The investors knew, were told what the parameters were. So it is not like a disclaimer. I mean, this is the agreement that the investors reviewed in determining whether they wanted to go forward with SJK. Assuming that is the case, but don't you think if he felt this was all above board, that he would have explained this to the investors to keep them apprised of what is really going on, as opposed to just keeping it to himself? There was no obligation for him to disclose any of this to the investors at that time. None of the investors were able to name the underlying funds and I know we are focusing on the Special Opportunities Fund, but there were at least 15 other underlying funds that their money went into and for which at trial they could not name where their money was going into. And so his belief was that I am treating it as I am all the other underlying funds. But when he was questioned by the SEC, by the auditors, he did disclose the existence of the Special Opportunities Fund. There are no further questions. I will reserve my time. Mr. McClain. May it please the Court. My name is Steve McClain. I represent the United States in this matter. I am here with Russell Phillips and he and I tried the case together in the District Court. In terms of the sufficiency of the evidence, Your Honors, this Court has made clear that a scheme to defraud can be based and proven and a jury can find such a scheme if there are material misrepresentations affirmative or if there are material concealments, either one. And in this case, there was abundant evidence before the jury such that it could have found both misrepresentations affirmative and concealments. The most significant one that was proved at trial were the monthly statements. The receiver came in and explained that the monthly statements that were going out in 2010 to the investors were representing that their investments were worth over $24 million in total. The receiver came in and found there was really nothing behind those numbers of real substance. There was about a million in a bank account and there was a beach home that was worth about $3 million. And he found that the real value of their investments was $4.6 million. And counts 2 through 22 of the indictment were these monthly statements. And so every month throughout 2010, there was a continuing misrepresentation affirmative being made to the investors to the tune of $20 million that their investments were worth $20 million more than they really were. And in fact, they lost money. There was over a $9 million restitution judgment in this case that when the receiver came and we had the sentencing, it turns out that they were owed $9 million even though they had been invested with Mr. Kowalewski for a long period of time. Another important affirmative misrepresentation was that he had $400 million under management. The investors described that was important to them. They wanted to be invested in a big fund, so they had a small piece of it. And in reality, as the evidence showed, he only had $70 million in investment. And so St. Joseph Candler, for instance, who had $30 million with the defendant, they owned almost half of this fund. They thought they had a small piece of it and the risk was diversified. In fact, they had a large piece of it. He also represented that he invested in equities, not including real estate. The evidence showed that he did invest in real estate, including his own homes and a beach home. So it was self-dealing. So not only was it real estate, it was self-dealing real estate. He represented that he invested in unaffiliated funds. He told Mr. Mumford that, that he was going to do what he always did at Columbia. And the evidence showed that he diverted $16 million of the $70 into an affiliated fund, which he then used as a slush fund to buy his own personal homes and to engage in self-dealing. Was there evidence concerning where the remainder of the money went? Was part of the money actually invested, for example, in equities or startup companies or other opportunities in the market one way or another? Do you mean of the $16 million or do you mean of the $70? Of the $70. Of the $70. The remainder was invested in other hedge funds as he had represented. So he marketed himself as a fund of funds manager that would take the money and invest in other hedge funds, Black Diamond and some others were mentioned at trial. And the evidence is that he did do that with the other money other than the $16 million. The $16 million went down to his affiliated fund, the Special Opportunities Fund, which was not an unaffiliated fund. It was run by him. It didn't invest in things like the other hedge funds and equity strategies. And then he pulled the money off to buy his own homes, his parents' home, his brother-in-law's home and the beach home. So that was a little bit more than a quarter of the money in all of the funds? That's correct. I think it was over 20% is what we calculated. One of the provisions of the PPMs said that he would only invest 15% in any one fund. And so that was, in fact, violated. But of course, the bigger misrepresentation is that it went towards self-dealing and toward real estate instead of toward equity and unaffiliated funds as he represented. There was also misrepresentations about how he would be compensated. He received over $4 million alone in October 2010, which was far more than the 1% and 10% structure he represented to investors. He misrepresented the valuations. He said they'd be done according to GAAP by independent brokers. And of course, he, as the evidence showed, just inflated. For instance, one bank account he had $250,000 in and he inflated it up to a $10 million valuation on the idea that he hoped to one day use that money to buy a landfill, which was going to kind of hit the lottery. And so the valuations were not by GAAP and they weren't by independent brokers. The concealments also support the conviction. He concealed the existence of the Special Opportunities Fund. He concealed the existence of the self-dealing. He concealed the fact that he had moved the $16 million down to this fund that he then used for his personal self-dealing. And all the investors testified that they would not have invested with the defendant if they had known of those concealments. So each and every one of those concealments was material. The Special Opportunities Fund in and of itself was a major concealment because no one knew about it and that was the vehicle he used for the self-dealing. Just to address two remaining points, we cite the cases on page 33 of our brief that the fact that there were these contractual documents do not excuse the criminal behavior. The Seventh Circuit, the Tenth Circuit, the Fifth Circuit, recently in June 2017, the conviction. If there are affirmative misrepresentations, the fact that they may contradict writing, although it may be important in a civil case, is not in a criminal case if there is an intent to defraud. And here the jury found there was. Those cases, this Court's case in Svett, although this Court, we haven't found a case that directly addresses this issue of the importance of written contractual provisions in a criminal case like Weaver did recently by the Second Circuit. This Court's decision in Svett, we believe, it does logically flow from that. In Svett, this Court held that the negligence of an investor is not a defense. Whether an investor reasonably relied is not a defense in a criminal case. And as these other circuits have pointed out, that's really what the disclaimer language is relevant to. It's really an argument that the investors should not have relied on the oral representations. It's really an argument that the investors were negligent because they should have read the writing more carefully and not have depended on oral representations or on material concealments. And in fact, Weaver cites this Court's decision in Svett to bolster its holding that these sorts of written contractual provisions cannot excuse a criminal violation if there is intent to defraud, which there was in this case. Well, those provisions can eliminate some of the possible bases for fraud prosecution. For example, if you give the investment manager unfettered discretion to invest in anything and there's proper disclosure of that investment, you can't claim that the investment manager went crazy to the extent that he can be prosecuted for fraud if he invested in something that was wildly speculative, right? What you're saying is you can't, you don't consent to misrepresentations being made to you whether oral or written, even if you give the investment manager discretion. That's correct. And even, Your Honor, in that, that's not this case, of course, but even in a case where there was that kind of language that you just hypothesized, what these other circuits have said in these cases that we cite in our brief say is that if there were oral representations that notwithstanding that language, what I'm going to do with your money is put it in equity and not in real estate. I'm going to use it for this particular purpose. That a jury, they could acquit based on the language that's part of your hypothetical, but it would be permitted for them to convict because they could decide that those oral misrepresentations were part of a scheme to defraud and that the written disclaimers were actually part of the scheme. That if what you intended to do is come into court and say, well, I have the fine print that undoes my oral misrepresentations, a jury, if they found there was an intent to defraud, there was a scheme associated with using that disclaimer language that contradicted the oral misrepresentations, a jury could convict under those facts. But I agree if that's all, if there was nothing that was inconsistent with the writing, then that would, that would be a defense, that if the oral representations were consistent with that writing. But I think these cases say when they're inconsistent, you can't say the writing trumps the oral. There is no parole evidence rule in a criminal case and a jury is entitled to consider everything. They're oral, they're written, and then determine if there's a scheme. The one thing I wanted to pick up just on Judge Huck's question about Mr. Coble, it's true that he testified about the appraisal being $3.3 million and that that was a misrepresentation. And I wanted to highlight the fact that many witnesses testified that what the defendant said about him was not true whenever he testified in the SEC deposition. And I believe that's important evidence of intent, that the reason the defendant was lying to the SEC about what Mr. Coble had said about an appraisal, about what other appraisers had said, about what lawyers had told him, about what other professionals had said, it proves that at the time he was engaging in these transactions, he in fact had an intent to defraud. And that's why he was lying about them to the SEC later in 2010 when he was questioned. So again, very powerful evidence of an intent to defraud that really there was no response to in the evidence at trial. These witnesses testified unequivocally and there was really no counter evidence that they somehow had not said that. As a final point, Your Honor, I don't think Tagaloff affects this case. As this Court made clear in Tagaloff, if the misrepresentations go to the nature of the bargain or to the value of the bargain, you're outside Tagaloff. And here, of course, the misrepresentations went to both of those things, most importantly to the value of the bargain. Again, the representation was they had $24 million, they really had about $4.6 million, so it goes to the value of the bargain. The misrepresentations also went to the nature of the bargain because they were being told equity strategies. In reality, it was real estate. They were being told unaffiliated hedge funds. In reality, it was the affiliated self-dealing hedge fund. So it went to both the nature of the bargain and the value of the bargain, which we submit would take the case outside of Tagaloff. So if there's no further questions, we ask the Court. Mr. Payne, I have a question. Frankly, it didn't occur to me until this morning and it's a small issue, I think, in this case, but I'm curious about it. He was convicted of obstruction of justice with regard to his representations to the SEC. Yes, Your Honor. And then when sentencing time came, he got a two-level enhancement based on obstruction of justice for the same act. Is that not double dipping? No, Your Honor. There is a guideline provision that says that if you are convicted of a substantive obstruction offense, along with an underlying offense like wire fraud, what the Court has to do is to group all the offenses together. So don't have two groups, just have one group, which is what Judge Story did. And then you add two levels to the overarching offense level, which is exactly what the Court  So the guidelines actually . . . I didn't have a chance . . . I thought about this morning and didn't have a chance to look it up. Yes, Your Honor. And there's an application note that says that if it's an underlying obstructive offense. So thank you. Thank you. Thank you. Thank you.       Thank you. Thank you. Thank you. Thank you. Thank you. Mr. McClain just stated that Mr. Kovalevsky's misrepresentations went to the value of the bargain and the nature of the bargain. And he referred to the value of their money and the fact that the funds, the special opportunities fund, was an affiliated fund. I disagree with Mr. McClain's framing of the issue. To me and Mr. Kovalevsky, the value of the bargain is what was in the PPM. That stated that he could invest a . . . or left the possibility, substantially all, meaning a portion could go to an affiliated fund. That document did not make any guarantees about any money that would be made for the investors. So I think Tackle-Off is directly on point. Ms. Coward? To Mr. McClain's point, if this was . . . there was no intent to defraud, why would your client make misrepresentations about valuation, fact-dating documents to the SEC? I think if, to the extent the court is looking at that, then it has to do with the obstruction, the conspiracy and the obstruction count, as opposed to the intent he had with respect to those investors. I think Mr. McClain's point is a little different. He's saying this is evidence of a mind intending to have fraudulently done these things. And if he felt that they were well within his prerogative under the documents, there would be no need to misrepresent these things to the SEC. I think that's his point. Right. But he also, during that statement, I mean, disclosed the special opportunities fund, did disclose that some of the investors did not know about it. So, I think it's not as clear cut as Mr. McClain is stating. I understand the witnesses testified differently at trial that they did not know that. But Mr. Kovalevsky admitted that some investors knew and admitted that some did not know. So I think he did disclose it and there's evidence that he did disclose it to people, what he was doing. Your client's raised a lot of issues. We've talked about sufficiency of the evidence. What's your next best point or the one you want to discuss for at least a minute or two? I think the sufficiency of the evidence is most important to my client. But in terms of sentencing, I do think that the obstruction, I don't believe that he should have gotten the two levels for the obstruction. I don't believe he should have gotten the aggravated, the role enhancement when it only went towards the obstruction count. So the guidelines, there should have been two separate groups, one for the wire fraud, one for the obstruction. Once you calculated the obstruction, it would have been much lower, more than eight levels lower than the fraud guideline and it should have wiped away the obstruction and the aggravated role because Judge Story found that the aggravated role was solely related to the obstruction, I believe, that Mr. Kovalevsky and Mr. Fulcher had obstructed, worked together to obstruct the SEC. He did not make a finding that Mr. Fulcher was a criminal participant in the fraud and this Court's precedent in Enrico is that you need to have at least one other participant engaged in the criminal activity. So I think he should not have received the role level, the two levels for the role and the obstruction should have fallen away completely. That's all I have. Thank you. Thank you. Thank you. We'll move to the next case, Lucky Capital v. Miller.